# El Pueblo *v.* Dimas et al.

## Apelación procedente de la Corte de Distrito de San Juan, Sección 1ª.

### No. 795.—Resuelto en diciembre 21, 1912.

Manglares—Terrenos del Dominio Público.—Los manglares en Puerto Rico ya se les considere como montes del Estado, como terrenos inundados por las aguas del mar, o como realengos o baldíos, es necesario concluir que son del dominio público y que sólo pueden pasar al privado por los medios claramente establecidos en las leyes.

Id.—Terrenos del Dominio Público—Tratado de París—Cesión a los Estados Unidos.—De acuerdo con el artículo 8 del Tratado de París, con las leyes, con las opiniones de los tratadistas y con su propia naturaleza, los manglares de Puerto Rico, montes inundados por el mar, fueron cedidos por el Soberano Español al Soberano Americano. Aun cuando el lenguaje del Tratado de París hubiere sido ménos claro, tal cesión hubiera tenido lugar, pues es principio bien establecido, que cuando un gobierno· extranjero cede territorio a los Estados Unidos, las tierras baldías y sin dueño pasan al dominio de los Estados Unidos.

Id.—Ley Foraker—Reserva de Tierras Públicas por el Presidente de los Estados Unidos.—De acuerdo con la ley Foraker de abril 12, 1900, en relación con la ley del Congreso de los Estados Unidos de julio 1, 1902, autorizando al Presidente para reservar tierras públicas en Puerto Rico para usos públicos y otras leyes y proclamas sobre la materia, el título de la parcela de terreno en litigio corresponde al Pueblo de Puerto Rico, a menos que se demostrara que por alguno de los medios reconocidos en derecho había pasado a los demandados.

Id.—Terceros.—Los demandados Calvo y Andrés no tienen el carácter de terceros con arreglo a la Ley Hipotecaria; Calvo porque fué el que tramitó el expediente de dominio y Andrés porque después de iniciado el pleito se constituyó en demandado en sustitución de Calvo y no alegó en tiempo que tuviera tal carácter. Además, constando claramente en el registro que las tierras en litigio se formaron por la desecación de manglares y que el título de Calvo no se obtuvo por los medios establecidos en la ley para tales casos, no pueden dichos demandados alegar la condición de terceros.

Id.—Título de Propiedad.—Examinadas las pruebas resulta que el demandado Calvo no había adquirido título de propiedad a las tierras en litigio del gobierno español, ni lo obtuvo después del gobierno americano.

Id.—Título de Propiedad por Prescripción—Montes Públicos.—Los manglares en Puerto Rico se consideraban como montes del Estado y en las ordenanzas de montes aprobadas por Real Decreto de abril 21, 1876, se estableció el procedimiento para la venta y aprovechamiento de dichos montes.

Id.—Composición de Terrenos Realengos.—De acuerdo con el reglamento para la composición de terrenos realengos en Puerto Rico, de abril 17, 1884, el demandado Calvo, aun suponiendo que los terrenos en litigio puedan considerarse como realengos, no había adquirido por prescripción ningún de-

recho de propiedad sobre dichas tierras el 6 de septiembre de 1897, cuando se dirigió al Gobierno Español de acuerdo con el citado reglamento.

ID.—TERRENOS PÚBLICOS—PRESCRIPCIÓN ADQUISITIVA—EXPEDIENTE DE DOMINIO.— La posesión por el demandado Calvo de las tierras en litigio, con conocimiento de que eran terrenos públicos, no puede estimarse a título de dueño, ni por tanto, con justo título.

ID.—TERRENOS PÚBLICOS—PRESCRIPCIÓN ADQUISITIVA CONTRA LOS ESTADOS UNIDOS.—Aunque los terrenos públicos cedidos por el gobierno español a los Estados Unidos pudieran adquirirse por prescripción bajo las antiguas leyes, no obstante, si el dominio no llegó a consolidarse en el poseedor antes de haberse realizado la cesión, la prescripción no puede alegarse contra los Estados Unidos.

ID.—TERRENOS PÚBLICOS—PRESCRIPCIÓN ADQUISITIVA CONTRA EL PUEBLO DE PUERTO RICO.—Aunque los terrenos cedidos a los Estados Unidos y adquiridos más tarde por El Pueblo de Puerto Rico, estuvieran sujetos a prescripción bajo las leyes en vigor anteriormente, no obstante, si al efectuarse el cambio de soberanía el dominio no se había consolidado en el poseedor, la prescripción quedó interrumpida no pudiendo invocarse hoy en contra del Pueblo de Puerto Rico.

ID.—PRESCRIPCIÓN—DERECHOS ADQUIRIDOS.—La prescripción no es un derecho creado o adquirido ya, sino una mera espectativa, una esperanza, cuyo cumplimiento o realización depende de una multitud de eventualidades.

ID.—CESIÓN DE TERRITORIO POR UNA SOBERANÍA A OTRA—LEY REGULADORA DE LOS TERRENOS PÚBLICOS.—Cuando una soberanía cede a otra algún territorio, las leyes de la primera autorizando la enajenación de la propiedad pública y la autoridad de los funcionarios encargados de llevarla a efecto, quedan completamente derogadas. Los terrenos cedidos por la nación española a los Estados Unidos, deben gobernarse y regularse por las leyes de los Estados Unidos y no por las leyes de España.

ID.—PRESCRIPCIÓN EXTINTIVA DE LA ACCIÓN DEL PUEBLO DE PUERTO RICO.—Habiéndose llegado a la conclusión de que no puede alegarse la prescripción adquisitiva en contra de el Pueblo de Puerto Rico a partir del 1898, a menos que hubiera consolidado con anterioridad a dicha fecha, es necesario concluir que tampoco cabe alegar con éxito la prescripción extintiva de la acción del Pueblo para reivindicar sus tierras públicas.

ID.—EXPEDIENTE DE DOMINIO—TIERRAS PÚBLICAS—ACCIÓN REIVINDICATORIA— NULIDAD DEL TÍTULO DEL DEMANDADO.—La doctrina legal de que cuando se ejercita la acción reivindicatoria contra personas que están en posesión de la cosa objeto del pleito en virtud de un título que se tenía por legítimo, es preciso que antes se pida la nulidad de éste, sólo tiene aplicación cuando la nulidad produce la acción, pero no cuando el derecho de reivindicar es independiente de ella.

ID.—COSA JUZGADA—SENTENCIAS DICTADAS EN EXPEDIENTES DE DOMINIO—OPOSICIÓN.—Para que un expediente de dominio se convierta de procedimiento *ex parte* en contencioso, no basta que una parte alegue su oposición, sino que es necesario que la formule y presente. Las sentencias declaratorias del dominio dictadas en los expedientes de dominio autorizados por la Ley Hipotecaria, no tienen autoridad de cosa juzgada.

RECONVENCIÓN—GASTOS EN LA DESECACIÓN DE MANGLARES.—El que voluntariamente invierta dinero en la desecación de manglares sin autorización del

gobierno, y sin título de propiedad sobre dichos manglares, no puede reclamar luego por medio de reconvención, que le sean reembolsados dichos gastos.

Los hechos están expresados en la opinión.

Abogado del apelante Honorato Andrés: *Sr. Eugenio Benítez Castaño.*

Abogado de El Pueblo: *Sr. Charles E. Foote, Fiscal.*

EL JUEZ ASOCIADO SR. DEL TORO, emitió la opinión del tribunal.

El presente es un pleito civil, sobre reivindicación de una parcela de terreno, seguido por El Pueblo de Puerto Rico contra José Dimas Riera, Enrique Calvo Ríos, Wenceslao Bosch, y luego contra Honorato Andrés, que se constituyó en demandado como adquirente de los derechos de Enrique Calvo. La corte de distrito dictó sentencia declarando con lugar la demanda en cuanto a la porción de la parcela de terreno poseída por Enrique Calvo y por él trasmitida a Honorato Andrés y sin lugar en cuanto a las otras porciones de la misma parcela, poseídas por los otros demandados José Dimas Riera y Wenceslao Bosch. Contra dicha sentencia, Honorato Andrés interpuso el presente recurso de apelación.

En la demanda del Pueblo de Puerto Rico, se alegan los siguientes hechos:

"Primero. Que a El Pueblo de Puerto Rico le corresponde la propiedad y dominio pleno de la siguiente finca:

" 'Parcela de terreno situada en el barrio de Puerta de Tierra compuesto de 12,090 metros cuadrados que colindan por el Norte en 82 metros con parte del solar No. 120 y los solares Nos. 121, 122, 123, y 124 de la propiedad de Don Andrés Calvo y Hermida, situado en la parte Sur de la vía férrea de la American Railroad Company of Porto Rico; por el Sur con los manglares del caño denominado San Antonio; por el Este con la calle de San Andrés, en una extensión de 240 metros, y por el Oeste en 55 metros con solar de Don Marcos Caneja, o sea la prolongación del solar No. 119 del barrio inferior de Puerta de Tierra.' `

"Segundo. Con fecha 8 de octubre de 1906, Don Enrique Y. Calvo Ríos promovió un expediente de dominio ante la Corte de

Distrito de San Juan, alegando que era él el dueño de la finca descrita por compra a Don Andrés Calvo Hermida y a Doña María F. Ríos, quienes la habían hecho suya por desecación de la zona de manglares que antes la constituían y la poseían desde el año 1883; y la corte, oída la información ofrecida por el promovente, declaró justificado el dominio de dicha finca a favor de Enrique Calvo Ríos, la cual se encuentra inscrita en el Registro de la Propiedad de San Juan, al folio 116 del tomo 69 de San Juan, bajo el número 2857. Y aparece de la inscripción primera hecha en el tomo y folio anteriormente citados, del mencionado Registro de la Propiedad de San Juan, Sección Primera, que efectivamente Don Enrique Calvo había acudido a la Corte de Distrito de San Juan para acreditar el dominio de esa finca, habiéndola adquirido de Don Andrés Calvo y Hermida y Doña María Felícita Ríos, los cuales la hicieron suya por desecación de la zona de manglares que antes la constituían y la poseyeron desde el 1883 o 1885, teniéndola sembrada de yerba.

"Tercero. Posteriormente Don Enrique Calvo Ríos vendió el cuarenta por ciento del total de la finca a Don Mariano Pesquera Goenaga y éste vendió a su vez el 17 por ciento a Don Wenceslao Bosch y un 7 por ciento del valor total de la finca a Don Martín Bellber. Más tarde, los Sres. Bellber, Pesquera Goenaga y Calvo Ríos le venden al Sr. Dimas Riera las participaciones que poseían en la finca descrita, a saber: Bellber el 7 por ciento del total de la finca, que a Pesquera había comprado; Pesquera, el 16 por ciento de la finca que poseía aún, y Calvo Ríos la mitad de su condominio, o sea el 30 por ciento del valor total de la susodicha finca, resultando en definitiva que los actuales poseedores de la finca, son, con perjuicio del demandante, los tres demandados en la proporción siguiente: Don José Dimas Riera, un 53 por ciento; Don Enrique Calvo, un 30 por ciento, y Don Wenceslao Bosch, un 17 por ciento."

Los demandados Riera, Bosch y Calvo alegaron la excepción de que la demanda no aducía hechos suficientes para determinar una causa de acción y la Corte de Distrito de San Juan presidida entonces por el Juez Martin E. Gill, declaró sin lugar dicha excepción por medio de una resolución fundada que dice así:

"De la demanda en este pleito parece que, en el año 1883, Don Andrés Calvo Hermida y Doña María F. Ríos, desecaron, o empezaron a desecar, unos terrenos a la orilla de la Bahía de San Juan,

en el lugar denominado Puerta de Tierra, que forma parte del Municipio de San Juan.

"En octubre de 1906, Don Enrique Calvo Ríos promovió un expediente de dominio, ante la Corte de Distrito de San Juan, y la corte, oída la información ofrecida por el promovente, declaró justificado el dominio de dicha finca a favor de Don Enrique Calvo Ríos, la cual se encuentra en el registro de la propiedad inscrita.

"Se trata ahora de determinar los derechos de dicho Señor Enrique Calvo Ríos.

"Es de conocimiento general, que los terrenos de Puerto Rico, no adscritos a un dominio particular, pertenecían a la Corona de España; que más tarde se traspasaron al Gobierno de los Estados Unidos; y más tarde aun, al Pueblo de Puerto Rico. Suponiendo ahora que en tiempo de España la prescripción pudiera oponerse a los derechos de la Corona, es claro que el período de prescripción no había expirado antes de la adopción del Código Político de 1902.

"Parece también que, ni el Señor Calvo Ríos, ni sus causantes, habían en 1902 cumplido los trámites administrativos por virtud de los cuales en tiempo de España, un particular podía obtener el dominio de terrenos baldíos.

"Así se deduce que, cuando se adoptó en 1902 el Código Político ahora vigente en Puerto Rico, ni el Señor Calvo Ríos, ni sus causantes, no tenían el dominio de la finca, ni el derecho a tal dominio.

"La Orden Judicial del Gobierno Militar Americano, citada por parte de los demandados en este pleito, se refiere únicamente al poseedor de buena fe y justo título y limita la prescripción a seis años. En el pleito actual la buena fe de la posesión del Señor Calvo Ríos, y sus causantes, tal vez no pueda negarse; pero tampoco se puede decir que en 1902 tuvieran ellos justo título.

"El artículo 9 del Código Político de 1902, declara: que el dominio de terrenos baldíos, o terrenos del Gobierno Insular, no puede adquirirse por prescripción.

"Resulta pues, que, con la adopción del Código Político, el período de prescripción se interrumpió, habiéndose cumplido solamente diez y nueve años de los veinte que hubieran sido necesarios por el régimen español.

"Más tarde, como se ha dicho ya, el Señor Calvo Ríos promovió un expediente de dominio, y es la opinión de la corte que tal

expediente de dominio no concede título válido contra el Gobierno, a lo menos cuando se trata de terrenos baldíos.

"Por tanto, se declara sin lugar la excepción previa en cuanto al demandado Don Enrique Calvo Ríos.

"De la demanda aparece que, después de haber obtenido el título de dominio, Don Enrique Calvo Ríos traspasó unas participaciones en la finca a los otros dos demandados Don José Dimas Riera y Don Wenceslao Bosch.

"Estos dos demandados, según sus abogados, alegan que no sólo tienen los mismos derechos como el Señor Calvo Ríos, sino derechos superiores por haber sido terceros.

"El hecho segundo de la demanda falta de claridad; pero es la opinión de la corte que estos dos demandados, cuando compraron sus participaciones en la finca, sabían, o tenían el deber de saber de los mismos libros del registro de la propiedad, que la finca era en 1883 propiedad del Gobierno. En otras palabras, tenían conocimiento legal de que la finca se había adquirido de terrenos baldíos, por desecación hechas por los causantes de Don Enrique Calvo Ríos.

"Por tanto, si esta corte no está equivocada en su interpretación de las alegaciones de la demanda, los dos demandados Señores Riera y Bosch están en igual situación con el demandado Calvo Ríos.

"En apoyo de la excepción previa se ha alegado que los artículos de la Ley Hipotecaria, en cuanto a derechos de terceros, tienen la misma fuerza y vigor en contra del Gobierno que tienen en cuanto a particulares. Hasta cierto punto la opinión de la corte está de acuerdo. Sin duda que si el individuo 'A' vende un solar al Gobierno para la construcción de una casa-escuela, la escritura de venta debe interpretarse de la misma manera y debe tener los mismos efectos como si 'A' hubiera vendido el solar al individuo 'B'; pero, tratándose de terrenos baldíos o realengos no se puede decir que los artículos de la Ley Hipotecaria conceden iguales derechos al individuo 'A' contra el Gobierno, que se concede al individuo 'A' contra el individuo 'B.'

"Las sentencias de la Corte Suprema de Puerto Rico, *Antuñano* v. *Reg. Prop.*, 1 Castro, 407, y *Gobián* v. *Reg. Prop.*, 3 Castro, 334, no parecen aplicables a terrenos baldíos.

"Por tanto, se declara sin lugar las excepciones previas de falta de causa de acción interpuesta por los demás demandados; con costas a todos los demandados.

"Se concede a los demandados veinte días, desde esta fecha, para presentar sus contestaciones a la demanda.''

Hemos transcrito la resolución del Juez Gill, porque en forma clara, sencilla y concisa expone las cuestiones fundamentales envueltas en este litigio, con excepción de aquellas que surgieron después en el desenvolvimiento del mismo y que, en su oportunidad, consideraremos debidamente.

Los demandados Riera y Bosch contestaron la demanda por medio de sus abogados Bosch y Soto, y el demandado Calvo también la contestó, por medio del suyo Damián Monserrat. Ambas contestaciones llevan fecha del mes de julio de 1910. En tal estado el procedimiento, compareció Honorato Andrés García, el 22 de diciembre de 1910, y presentó una moción para constituirse en demandado que dice así:

"Ahora comparece Honorato Andrés García, por medio de su Abogado Eugenio Benítez Castaño, y presenta esta moción para que se le constituya en parte demandada en este pleito, y al efecto alega:

"Que, con posterioridad a la presentación de esta demanda, el peticionario adquirió por compra a Enrique Calvo Ríos, según escritura otorgada ante el Notario Eugenio Benítez Castaño, toda la participación proindivisa que dicho Calvo tenía en el inmueble que en esta acción se discute, o sea el 30 por ciento de la totalidad de la finca.   El precitado documento se otorgó en esta ciudad el día 27 de septiembre de 1910.

"Que el peticionario tiene, en virtud de la adquisición predicha, un interés legítimo y directo en esta cuestión litigiosa, en oposición a las pretensiones del demandante.

"Y, por tanto, con arreglo al artículo 63 del Código de Enjuiciamiento Civil, suplica a la corte dicte una orden disponiendo que se incluya su nombre como parte demandada, y se le admita la contestación que formula a la demanda y que acompaña a esta solicitud, previa notificación a 'El Pueblo de Puerto Rico.' "

En su contestación el dicho demandado Honorato Andrés, hizo las siguientes alegaciones, que fueron extractadas por el propio apelante en su alegato así:

"*Como primera defensa alegó:* 1. Negó el título del demandante, afirmando que el pleno dominio de la finca corresponde a los demandados por compras hechas a su anterior dueño Enrique Calvo;

"2. Aceptó como cierta la alegación segunda de la demanda, o

sea, 'la' tramitación del expediente de dominio y lo que del registro de la propiedad aparece en la inscripción primera, y

"3. También admitió la certeza de las sucesivas ventas verificadas por Calvo, pero negando que ellas hubieran sido hechas en perjuicio de El Pueblo de Puerto Rico, pues los demandados han adquirido en virtud de justos títulos y de buena fe.

"*Como segunda defensa alegó:* 1. Que los demandados y sus antecesores en título, vienen poseyendo el inmueble desde el año 1881, o antes de esta fecha, en concepto de dueños del mismo, sin interrupción alguna, y pública, quieta y pacíficamente;

"2. Que la posesión del primitivo poseedor del inmueble principió antes del año 1881, a virtud de concesión o autorización del Gobierno de España para desecar cierta zona de manglares y transformarla en zona vegetal, merced al trabajo y gastos hechos por el referido primitivo dueño o poseedor, del cual dimanan su derechos los demandados.  Que aquella zona de manglares es la zona vegetal o terreno cultivado que hoy se discute.  Que en el año 1883 el Gobierno de España expidió a favor de aquellos primeros poseedores una certificación creditiva de que ya habían desecado y eran de la propiedad de ellos una zona de más de ocho mil metros que tenían en cultivo, y

"3. Que a los demandados les corresponde el dominio absoluto de dicho inmueble, por título de prescripción, a tenor de lo dispuesto en el artículo 2 del Reglamento para la Composición de Terrenos Realengos en la Isla de Puerto Rico, aprobado por Real Decreto de 17 de abril de 1884.

"*Como tercera defensa alegó:* 1. Que los demandados, por su posesión y la de sus predecesores, han adquirido el dominio pleno de dicho inmueble, por título de prescripción, ya según los artículos 1 y 7 de la Orden Judicial de 4 de abril de 1899, o ya según el artículo 1957 del anterior Código Civil Español, en relación con el 1840 del vigente Código Civil.

"*Como cuarta defensa alegó:* 1. La prescripción extintiva de la acción del demandante, según el artículo 1864 párrafo 1°. del Código Civil vigente.

"*Como quinta defensa alegó:* 1. La de *res judicata,* por la controversia de que fué objeto el expediente de dominio referido en la demanda.

"*Como sexta defensa alegó:* 1. La carencia de título del demandante para ejercitar la acción reivindicatoria;

"2. El hecho de que el inmueble en litigio se hallaba desde hace

mucho tiempo bajo la posesión y dominio de personas particulares, sin oposición de nadie, y

"3. Que los actuales poseedores de la finca la tienen en virtud de títulos, cuya nulidad no se solicita en la demanda, y tales títulos están surtiendo sus efectos legales.

"*Reconvención.*—El demandado Sr. Andrés estableció su reconvención alegando: 'Que los primitivos dueños de los terrenos, con buena fe y a ciencia y paciencia del Gobierno de España, practicaron en ellos las obras de desecación por las cuales aquellos terrenos adquirieron todo el valor que hoy tienen. Y que tales obras o mejoras, en cuanto se refiere el condominio de este demandado, tiene un valor de cinco mil dollars.'

"*Súplica.*—Contestando la demanda el demandado suplicó a la corte que por todas o cualquiera de las defensas establecidas en la contestación, se desestime la demanda de El Pueblo de Puerto Rico."

Y en su reconvención el mismo demandado suplicó a la corte que en el caso de declarar con lugar la demanda, se condene al Pueblo de Puerto Rico a satisfacerle la referida suma de cinco mil dollars.

Con tales alegaciones como base, fué el pleito a juicio y quedó concluso para sentencia.

En 23 de junio de 1911 los abogados de todas las partes estipularon lo siguiente:

"*Por cuanto:* La susodicha causa fué oportunamente presentada para su vista ante el Hon. Martín E. Gill, Juez de la citada corte, y después de una amplia y detenida discusión de todas las materias y cuestiones que entraña, fué sometida a dicho Martín E. Gill para su resolución, y

"*Por cuanto:* No hubo de dictarse resolución definitiva sobre las materias en controversia en dicho pleito por el Sr. Juez Martín E. Gill, quedando hoy dichas materias y cuestiones pendientes de resolución;

"*Por tanto:* Estipúlase por la presente entre los Sres. Luis Llorens Torres, abogado del demandado Honorato Andrés García, y Wenceslao Bosch y Eugenio Benítez Castaño, abogados de los demandados José Dimas Riera, Enrique Calvo y Wenceslao Bosch, por una parte, y Foster V. Brown, Attorney General de Puerto Rico, en representación del demandante, por la otra, que la causa arriba citada se traspase a la Corte de Distrito para el Distrito Judicial de

San Juan, Puerto Rico, Sección 1, presidida hoy por el Hon. Félix Córdova Dávila, quien queda autorizado para resolver y dictar sentencia sobre las materias y cuestiones contenidas en la misma, con vista de los autos de la causa y alegatos en ella presentados, como si originalmente se hubiese incoado ante dicho Señor Félix Córdova Dávila.''

En 12 de julio de 1911 el demandado Honorato Andrés por medio de su abogado Eugenio Benítez, presentó los siguientes escritos:

''El demandado Honorato Andrés García, por medio de su abogado, Eugenio Benítez, con el permiso obtenido de la corte, enmienda su contestación a la demanda presentada en este caso, adicionando a la misma la siguiente:

''*Séptima defensa*—El demandado adquirió la participación proindivisa que en la finca objeto de este pleito le corresponde, por compra a Enrique Calvo Ríos, persona que, según el registro de la propiedad, tenía derecho para enajenar el inmueble, sin que de dicho registro apareciera anotada la demanda de El Pueblo de Puerto Rico, ni causa alguna legal que impidiera dicha enajenación; y, por tanto, el demandado alega que él es un tercero al amparo de lo que preceptúa el artículo 34 de la Ley Hipotecaria vigente.

''El demandado Honorato Andrés García, por medio de su abogado, Eugenio Benítez Castaño, ante la corte comparece y expone:

''Que dicho demandado presentó su contestación a la demanda en 22 de diciembre de 1910.

''Que por la prueba documental aportada a este juicio se evidencia claramente que en treinta de diciembre del propio año, según certificación expedida por el registrador de la propiedad en tal fecha, la participación proindivisa que al demandado corresponde en la finca discutida en este pleito, estaba sólo sujeta a un gravamen hipotecario constituído a favor de Luis Sánchez Morales, sin que del registro apareciese que El Pueblo de Puerto Rico hubiera anotado su demanda ni dado aviso alguno que pudiera servir de advertencia a un tercero poseedor.

''Que este pleito está pendiente del fallo del Hon. Juez Félix Córdova Dávila, a quien se ha sometido por estipulación escrita de las partes.

''Que al demandado interesa enmendar su contestación para conformarla con la prueba, agregando a dicha contestación la alegación que se expresa en el adjunto escrito, y, al efecto,

"A la corte suplica se sirva permitirle esta enmienda con tal objeto."

Al pie del último de dichos escritos, hay una nota que dice: "Denegada, Minuta, Fol. 31/11. Firmado. A. Marín. Secretario."

Y, por último, el 2 de agosto de 1911, el Juez Córdova Dávila de la Corte de Distrito de San Juan, dictó la sentencia a que nos hemos referido, basada en una opinión que se incluyó en el récord.

Los antecedentes expuestos, permiten entrar en la consideración y resolución de las cuestiones debatidas en este caso, con pleno conocimiento de las mismas. En su estudio, seguiremos el siguiente orden: primero examinaremos el título del demandante y luego el del demandado, después analizaremos las cuestiones promovidas sobre la prescripción de la acción del demandante, sobre si era necesario que antes de la reivindicatoria se ejercitara la acción de nulidad, y sobre cosa juzgada, y, por último, estudiaremos la reconvención del demandado y apelante.

No hay duda alguna con respecto a la naturaleza de las tierras que forman la parcela cuya propiedad se discute en este litigio. Dicha parcela, situada en el barrio de Puerta de Tierra de esta ciudad de San Juan y colindante en la actualidad por el sur con los manglares del caño denominado de San Antonio, se formó por desecación de una zona de manglares.

"Manglar" es un sitio poblado de mangles, y "mangle" es un árbol que crece con gran abundancia en las costas, cayos y ciénagas de la América intertropical. (Véase el Diccionario de la Lengua Castellana, por la Academia, y el Enciclopédico de la misma lengua, por Zerolo.)

Los manglares pueden explotarse, bien destinando las ramas y troncos de los mangles a leña o a la fabricación de carbón o de duelas para pipas y barriles, ya empleando la corteza de cierta variedad como materia tintórea, ya apro-

vechando sus raíces para la construcción de casas, o ya, por último, desecándolos y obteniendo como resultado, terrenos firmes de gran valor generalmente.

Los manglares en Puerto Rico eran considerados como montes del Estado, y, bien se les reconozca este carácter, ya se les considere como terrenos inundados por las aguas del mar, o ya como realengos o baldíos, es necesario concluir que eran del dominio público y que sólo podían pasar al privado por los medios claramente establecidos en las leyes.

Atendida, pues, la naturaleza de las tierras que forman la parcela en litigio, es necesario concluir que el dominio de dicha parcela correspondía al Estado. Además, como veremos más adelante, Andrés Calvo, la persona de quien alegan que derivan sus derechos los demandados, al dirigirse al Estado Español con el fin de adquirir la propiedad de la parcela por composición reconoció expresamente el título incuestionable del Estado.

Por virtud del Artículo VIII del Tratado de París, España cedió a los Estados Unidos "todos los edificios, muelles, cuarteles, fortalezas, establecimientos, vías públicas y demás bienes inmuebles que con arreglo a derecho son del dominio público, y como tal corresponden a la Corona de España."

El artículo 339 del Código Civil Español vigente cuando se celebró el Tratado de París, prescribe que son bienes de dominio público, "1.º Los destinados al uso público, como los caminos, canales, ríos, torrentes, puertos y puentes construídos por el Estado, las riberas, playas, radas y otros análogos; 2.º Los que pertenecen privativamente al Estado, etc.," y la Ley de Puertos, también vigente en aquella fecha, prescribe que es de dominio nacional y uso público, sin perjuicio de los derechos que correspondan a los particulares "la zona marítima terrestre, que es el espacio de las costas o fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde no lo sean."

La frase "*public property*," se usa comunmente para de-

signar aquellas cosas que son *"publici juris,"* y que están, por lo tanto, consideradas como pertenecientes al público, el estado o la comunidad y no limitadas al dominio de una persona privada. (32 Cyc., 651.) Y las palabras "terrenos públicos" o "dominio público" se usan habitualmente en los Estados Unidos para designar aquellos terrenos de los Estados Unidos o solamente de los Estados que se hallan sujetos a la venta o a cualquiera otra disposición bajo las leyes generales, no estando retenidos ni reservados para ningún propósito público, o especial del Gobierno. No hay una definición establecida por los estatutos de las palabras "terrenos públicos," y su interpretación puede sufrir alguna variación entre las diferentes leyes aprobadas para distintos propósitos, debiendo dárseles aquella interpretación que más se avenga con la intención del Congreso. (32 Cyc., 775-776.)

Es evidente, pues, que de acuerdo con los términos en que está redactado el Tratado de París, con las leyes, con las opiniones de los tratadistas, y con su propia naturaleza, los manglares de Puerto Rico, montes inundados por el mar, fueron cedidos por el Soberano Español al Soberano Americano.

Y esto sería siempre así aun cuando el lenguaje del Tratado hubiere sido menos claro, pues es principio bien establecido, que cuando un gobierno extranjero cede territorio a los Estados Unidos, las tierras baldías y sin dueños pasan al dominio de los Estados Unidos.

En el caso de *Woodworth* v. *Fulton,* la Corte Suprema de California se expresó así: "Los Estados Unidos, por la conquista de California, adquirieron en principio un título imperfecto sobre todo el dominio nacional de México situado en aquel territorio, cuyo título se perfeccionó por el tratado de paz. (Wheaton's International Law, páginas 208, 396, 440, ed. 1846; Vattel, 386.) El título de los Estados Unidos arranca del tiempo de la ocupación del país; y en tal virtud todas las leyes de México concernientes a la transferencia de tierras públicas, cesaron desde el momento en que California fué vencida y ocupada por las fuerzas americanas, y los ofi-

ciales, así mexicanos como americanos, no tenían poder, bajo las leyes previamente existentes, o bajo cualesquiera leyes de los Estados Unidos, para conceder, vender, o de otro modo disponer de cualquier porción del dominio nacional, que había sido transferido de la soberanía de México a la soberanía de los Estados Unidos.  (1 Cal., 295–308.)

En 12 de abril de 1900 el Congreso de los Estados Unidos pasó una ley para proveer, temporalmente, de rentas y de un Gobierno Civil a la Isla de Puerto Rico, y para otros fines. En la sección 13 de dicha ley se determinan las propiedades adquiridas por los Estados Unidos a virtud del Tratado de París que se entregan al gobierno establecido por la misma, para que las administre a beneficio del Pueblo de Puerto Rico. Entre esas propiedades figuran "todas las *orillas de los puertos, muelles,* embarcaderos y *terrenos saneados,* pero sin incluir la superficie de los puertos y aguas navegables."

En julio 1 de 1902 el Congreso pasó otra ley autorizando al Presidente para reservar tierras públicas y edificios en la Isla de Puerto Rico para usos públicos, y concediendo las otras tierras públicas y edificios al Gobierno de Puerto Rico, y para otros fines.  En cumplimiento de dicha ley y por medio de varias proclamas, el Presidente reservó ciertos terrenos y edificios, entre los cuales no se encuentra la parcela de terreno desecado procedente de manglares, sobre que versa este pleito.  (Leyes del Congreso de 1 de julio de 1902, 4 de marzo de 1907 y 14 de junio de 1910; Proclamas del Presidente de 17 de enero de 1903, 26 de junio de 1903, 30 de junio de 1903, 4 de agosto de 1908, 26 de enero de 1912 y 13 de julio de 1912, y leyes de Puerto Rico de 16 de febrero de 1903 y 14 de marzo de 1907.)

En principio, pues, el título del demandante a la parcela en cuestión resulta demostrado claramente, y a menos que se probare que por alguno de los medios reconocidos en derecho había pasado a los demandados, la procedencia de la demanda es evidente.

La parcela reclamada se describe en la demanda y en la

sentencia, se identificó en el juicio y está poseída material-
mente por los demandados. Sobre esto no hay dudas de
ningún género. Las dudas surgen con respecto al título de
los demandados.

Ya hemos dicho que la demanda fué declarada sin lugar
con respecto a los demandados Bosch y Riera por estimar la
corte sentenciadora que concurría en favor de ellos la con-
dición de terceros por ellos alegada, que fué declarada con
lugar con respecto a la porción poseída por Calvo y por él
trasmitida a Andrés, y que la sentencia fué apelada sólo en
cuanto a este último extremo.

¿Eran Calvo y Andrés terceros con arreglo a la Ley Hipo-
tecaria? Evidentemente que no. Calvo, porque él mismo
fué el que tramitó el expediente de dominio a que más ade-
lante nos referiremos, y Andrés, porque adquirió de Calvo
durante el litigio y voluntariamente se constituyó en deman-
dado sin alegar la condición de tercero. Cuando intentó
hacerlo era ya demasiado tarde. El pleito en cuanto a él se
había celebrado bajo la teoría de que él se constituía en
demandado en sustitución de Calvo con todos sus derechos y
obligaciones. Si él hubiera alegado a su debido tiempo su
condición de tercero, el demandante hubiera podido demos-
trar que él tenía conocimiento del pleito y que había adquirido
las tierras a sabiendas de la reclamación del demandante.
Además, el motivo fundamental por virtud del cual se ha
llegado a la conclusión de que el título de las tierras en disputa
corresponde al Pueblo de Puerto Rico, o sea, que dichas
tierras se formaron por la desecación de manglares, constaba
claramente en el registro, y siendo esto así, de acuerdo con
lo prescrito expresamente en la misma Ley Hipotecaria, no
cabe alegar la condición de tercero.

Veamos ahora si Enrique Calvo llegó a adquirir y pudo
trasmitir algún título válido al apelante Andrés.

Enrique Calvo acudió a la Corte de Distrito de San Juan,
obtuvo que se declarara justificado a su favor el dominio de
la parcela en disputa y lo inscribió en el registro de la pro-

piedad con fecha 25 de septiembre de 1907. Dicho título será válido si las pruebas practicadas lo sostienen, o ineficaz en el caso contrario.

Examinemos dichas pruebas. Entre ellas figura un escrito dirigido al Intendente General de Hacienda por Andrés Calvo, fechado el 6 de septiembre de 1897, y en el cual manifiesta Calvo que hacía unos catorce años que había desecado una zona de mangles en el barrio de Puerta de Tierra, con sus propios y exclusivos recursos, haciendo cuantiosos sacrificios pecuniaros, hasta ponerlo en condiciones de terreno vegetal, que mide una superficie de 8,470 metros cuadrados con 50 céntimos de otro, como lo comprobaba una certificación facultativa que acompañaba, y en definitiva pedía que previas las formalidades que la autoridad a quien se dirigía estimara procedentes, se dieran las órdenes oportunas a fin de adquirir en propiedad dichos terrenos en composición con la hacienda, estando dispuesto a abonar de contado la cantidad que se estimase por el referido terreno, como era práctica establecida y se había venido efectuando hasta la fecha por la Intendencia General de Hacienda.

La certificación a que se refiere el escrito está expedida en 30 de noviembre de 1883 por José I. Hernández Costa, Ayudante Facultativo de Obras públicas, y en ella se expresa que a instancias de Don Andrés Calvo había reconocido y medido una zona de mangles que Calvo había desecado con sus propios recursos, convirtiéndola en terreno vegetal y que mide una superficie de 8,470 metros cuadrados con 50 céntimos de otro.

Sigue a la certificación un informe de fecha 22 de septiembre de 1897 suscrito por Don Manuel Villa Arroyo en que le dice al administrador general lo que se solicita en el escrito presentado por Andrés Calvo y lo que consta en la certificación de Hernández Costa, expresando al final que estando considerados los manglares como montes del Estado, el negociado entendía que procedía antes de proponer resolución, oir el parecer del facultativo ayudante de montes afectos

al servicio de dicho centro.  Al pie de dicho informe se hizo constar lo siguiente:  "La intervención conforme con el parecer del Negociado.  V. S. ilustrísima resolverá."  (Páginas 61 y 62 de la transcripción.)

No aparece cual fuera la resolución definitiva que se dictara por el Gobierno Español, pero puede presumirse que si se dictó alguna, no fué concediendo el título de propiedad solicitado, cuando en 1906, Enrique Calvo, a quien Andrés aparece vendiendo los terrenos, promovió el expediente de que se ha hecho mérito, a fin de obtener un título de dominio inscribible en el registro de la propiedad.

Veamos si puede concluirse que Andrés Calvo adquiriera las tierras de que se trata por prescripción.

Ya hemos dicho que los manglares se consideraban en Puerto Rico como montes del Estado.  El Título XVII, Libro IV de la Recopilación de las Leyes de Indias contiene algunas leyes sobre montes, que estuvieron vigentes con muy pocas modificaciones (7 Alcubilla, 549) hasta que se promulgaron las ordenanzas de montes para el servicio del ramo en las provincias de Cuba y Puerto Rico, aprobadas por Real Decreto de 21 de abril de 1876, 116 Colección Legislativa de España 359.

En dichas ordenanzas se establece que los montes se dividen en dos clases, a saber:  montes públicos y montes de particulares, reputándose públicos los del Estado, de los pueblos, etc., y siendo de particulares "los que con justo título pertenezcan al dominio privado."  (Artículos 2 y 3.)

Establecen también dichas ordenanzas que el ingeniero inspector de montes presentará al Gobernador General de la Provincia dos catálogos de montes públicos; uno de los que por sus condiciones merezcan ser reservados de la venta y otro de aquellos que sin menoscabo de los intereses públicos deban pasar al dominio particular, y que los montes incluídos en el segundo catálogo "podrán ser enajenados en subasta pública, previa tasación hecha por los empleados facultativos del ramo."  (Artículos 6 y 10.)

Obra en los autos (pág. 67 de la transcripción) una certificación relativa a un expediente sobre subasta de aprovechamiento de varios montes del Estado declarados reservables, durante el año de 1887 a 1888, en cuyo expediente existen varios anuncios de subasta entre ellos uno, del que resulta que el Gobernador General de conformidad con lo propuesto por la inspección de montes, se sirvió disponer que por la alcaldía se procediera a anunciar por medio de edictos en todos los barrios del término municipal la subasta y aprovechamiento de leñas durante el año económico de 1887 a 1888, del monte del Estado denominado "Manglar" de la parte norte de la bahía, señalándose para la celebración del acto el plazo de treinta días contados a partir de la publicación de los edictos. Este procedimiento está conforme con las disposiciones de las citadas ordenanzas consignadas en el Título V de las mismas que trata del "aprovechamiento de montes públicos."

Si a la luz de lo proceptuado en las ordenanzas de montes y de los hechos cuya existencia pone de manifiesto el expediente sobre subastas a que nos acabamos de referir, examinamos el informe que recayó al escrito de Andrés Calvo solicitando adquirir por composición la parcela de manglares desecada por él, nos explicaremos el por qué de no haber recaído resolución favorable a Calvo por parte del Gobierno, ya que lo que él había desecado era una parte de un monte público declarado reservable.

Estudiemos el caso en relación con el reglamento para la composición de terrenos realengos en Puerto Rico, de 17 de abril de 1884, cuyas prescripciones, por el lenguaje que emplea en su escrito, parece que invocó Andrés Calvo al solicitar que se le concediera el título de propiedad de la parcela de 8,470 metros cuadrados.

Dicho reglamento, según se expresa en la comunicación oficial del ministro de ultramar sometiéndolo a la aprobación del Rey, se dictó para suprimir una de las causas que impedían que el cultivo agrario no llegara a alcanzar en Puerto

Rico el alto grado de prosperidad de que es susceptible, a saber: la que estribaba en el estado incierto en que se encontraba todavía una gran parte de la propiedad territorial, pues la falta de cumplimiento por parte de los agraciados con terrenos por la Junta superior de repartimiento de terrenos baldíos creada en 1818 y suprimida en 1876, había traído como consecuencia una situación harto desfavorable a la agricultura puertorriqueña. (132 Colección. Legislativa de España, 329.)

El artículo 1 de dicho reglamento establece que "Se considerarán como realengos para los efectos de este reglamento, y con arreglo a la ley 14, tít. 12, libro 4º. de la Recopilación de Indias, todos los terrenos baldíos, suelos y tierras que no tenga dueño particular legítimo, o lo que es lo mismo, que no hayan pasado nunca al dominio privado, en virtud de concesión gratuita u onerosa, por parte de las autoridades competentes."

Y el artículo 2 dispone que "Se considerarán propietarios, para los efectos legales de este reglamento, los que acrediten haber adquirido los terrenos mediante Real cédula, concesión de la junta superior de repartimiento de terrenos baldíos, o título de autoridad competente, y haber cumplido las condiciones que por la concesión les fueron impuestas, cualquiera que sea el tiempo que lleven de posesión."

"Igualmente se considerarán propietarios los que, careciendo de título, acrediten haber poseído sin interrupción los expresados terrenos durante veinte años, si se encuentran en cultivo, y durante treinta, si se hallan incultos.

"Para que se entienda cultivado un terreno es necesario acreditar que lo ha estado en los tres años últimos."

Aceptando que los terrenos de que se trata en este pleito puedan considerarse como realengos, veamos si Andrés Calvo había ya adquirido un título cuando se dirigió al Gobierno de acuerdo con la ley especial sobre la materia.

Que él no tenía ninguna concesión de la junta superior

de repartimiento de terrenos baldíos, es evidente. Veamos si tenía algún derecho adquirido por prescripción.

La posesión de Andrés Calvo, según su propio escrito y según la conclusión a que llega el juez sentenciador después de analizar las pruebas aportadas en este pleito, data del año de 1883 y es bien claro que desde esa fecha a la del 6 de septiembre de 1897, no habían transcurrido los veinte años que el reglamento fija para adquirir los terrenos si se encontraban en cultivo, ni menos los treinta que señala para el caso de que se hallaran incultos. Luego es necesario concluir que tampoco tenía Andrés Calvo en aquella fecha ningún derecho a la propiedad de las tierras adquirido por prescripción, de acuerdo con el reglamento invocado.

Y si estudiamos el caso en relación con los preceptos generales del derecho en materia de prescripción, tampoco puede concluirse que fundándose en ellos pueda haberse adquirido por los demandados un título por prescripción.

Escriche define la prescripción adquisitiva como el modo de adquirir o hacer suya alguna cosa por tener la posesión de ella todo el tiempo que prefije la ley, y dice, además, que para que tenga lugar esta prescripción, son necesarios, hablando en general, cinco requisitos: 1º., justo título; 2º., buena fe; 3º., posesión continuada; 4º., el tiempo tasado por la ley; 5º., la prescriptibilidad de la cosa. (4 Escriche 639.) En estos principios se inspiran tanto las leyes antiguas como el Código Civil Español y el revisado y la Orden Judicial de 4 de abril de 1899.

Calvo sabía que lo que estaba desecando eran terrenos públicos y todo lo más que puede admitirse en su favor es que él lo hacía con la esperanza de que el Estado algún día le otorgaría el título de propiedad sobre los mismos. No puede, pues, concluirse que Calvo poseyera como dueño y con justo título las tierras en cuestión. El mismo consignó por escrito en 1897 que estaba dispuesto a abonar de contado la cantidad que se asignara por el referido terreno. Por

terrenos que nos pertenecen en plena propiedad, no tenemos que abonar cantidad alguna.

Bien se regule, pues, este caso por las Ordenanzas de Montes, bien por el reglamento para la composición de terrenos realengos, o ya se apliquen los preceptos generales del derecho en materia de prescripción, es necesario concluir que Andrés Calvo no llegó nunca a adquirir un título legal de propiedad sobre la parcela desecada, ni pudo, por consiguiente, trasmitirlo a Enrique Calvo, y en tal virtud que la sentencia declaratoria de dominio dictada por la Corte de Distrito de San Juan en 1906 a favor de Enrique Calvo, carece de validez legal.

Debe hacerse constar, además, que todas las pruebas relativas a la posesión antigua por parte de Andrés Calvo se refieren a una parcela de 8,470 metros, sin que conste de modo claro y preciso cuándo se desecaron los metros que faltan para llegar a los 12,090 que se acreditaron en el expediente de dominio. La diferencia, que alcanza a más de 3,500 metros, tuvo necesariamente que desecarse después del año de 1883.

Al fijar los derechos del demandado en este caso con referencia a la cuestión de prescripción, sólo podemos considerar los hechos acaecidos hasta el año de 1898 en que cesó la soberanía española en esta Isla y comenzó la americana. A partir de esa fecha, no era posible adquirir por prescripción los terrenos de que se trata en este pleito. A este respecto se expresa así el juez sentenciador:

"* * *. Según la máxima *Nullum tempus ocurrit regi,* aplicada en el derecho inglés como una regla invariable, no podía adquirirse ningún título a los terrenos de la Corona por la posesión adversa de los mismos. Esta regla ha sufrido más tarde algunos cambios por los estatutos. La doctrina Inglesa prevalece en los Estados Unidos, donde como en Inglaterra, no puede adquirirse título alguno contra la Soberanía por medio de la posesión adversa. De acuerdo con este principio, únicamente por medio de una ley del Congreso

haciendo directamente la concesión o autorizando a algún funcionario público para que la lleve a efecto, es que puede adquirirse el dominio sobre terrenos pertenecientes al Estado. En este caso, aunque los terrenos cedidos a los Estados Unidos pudieran adquirirse por prescripción bajo las antiguas leyes, no obstante, si el dominio no llegó a consolidarse en el poseedor antes de haberse realizado la cesión, la prescripción no puede alegarse contra los Estados Unidos. Véase sobre estos extremos el tomo 1, pág. 1111 y 1112 del Cyc.

"El mismo principio se aplica en favor de los Estados de la Unión. En la ausencia de una disposición autorizando la prescripción de los terrenos que a los Estados pertenezcan, no puede adquirirse título por la posesión adversa.

"Aunque la Legislatura del país hubiese permanecido en silencio, el dominio del pueblo sobre los terrenos de su propiedad no podría prescribir hoy aplicando la misma regla que a los Estados se aplica. La Asamblea Legislativa, sin embargo, ha consignado este precepto en el Código Político, cuyo artículo 9 dice de modo claro y terminante, que no puede adquirirse título a terrenos baldíos insulares por la posesión adversa de los mismos.

"De acuerdo con esta doctrina, aunque los terrenos cedidos a los Estados Unidos y adquiridos más tarde por el Pueblo de Puerto Rico, estuvieran sujetos a prescripción bajo las leyes en vigor anteriormente, no obstante, si al efectuarse el cambio de Soberanía el dominio no se había consolidado en el poseedor, la prescripción quedó interrumpida, no pudiendo invocarse hoy en contra de la parte demandante.

"La prescripción como dice muy bien el Sr. Manresa, en sus comentarios al Código Civil Español, no es un derecho creado o adquirido ya, sino una mera espectativa, una esperanza, cuyo cumplimiento o realización depende de una multitud de eventualidades; y como no es un derecho adquirido, no puede estimarse sujeta su realización a la legislación que antes rigiera, y bajo cuyo imperio quedara perfeccionado

dicho derecho, o el acto jurídico de que tuviera origen, o al que debiera su nacimiento.

"En virtud del cambio de Soberanía, consumado al firmarse el Tratado de Paz, se operó un cambio fundamental en las leyes políticas de este país, e *ipso facto* quedaron completamente derogadas todas las leyes de origen político, así como aquellas que dependían de la voluntad del Soberano, tales como la disposición y gobierno de la propiedad pública.

"Es una doctrina firmemente establecida que cuando una Soberanía cede a otra algún territorio, las leyes de la primera autorizando la enajenación de la propiedad pública y la autoridad de los funcionarios encargados de llevarla a efecto, quedan completamente derogadas. (*More* v. *Steinbach,* 127 U. S., 70, 81; *Ely's Adm'r.* v. *United States,* 171 U. S., 220, 230; *United States* v. *Vallejo,* 1 Black, 541; *Harcourt* v. *Gaillard,* 12 Wheat, 523.)

"De acuerdo con esta doctrina, los terrenos cedidos por la nación Española a los Estados Unidos, deben gobernarse y regularse por las leyes de este país y no por las leyes de la nación cedente." (Opinión del Juez sentenciador, Sr. Córdova Dávila, págs. 36, 37 y 38 de la transcripción.)

Pero se pretende sostener en este caso, que aun cuando no existiera la prescripción adquisitiva, se tendría que reconocer la existencia de la prescripción extintiva de la acción del demandante. En el año de 1898 Calvo no había adquirido por prescripción las tierras de que se trata, ni aun aplicado en su favor la ley más favorable a sus intereses o sea el reglamento para la adquisición de terrenos baldíos. Tampoco por consiguiente se había extinguido para el Estado en aquella fecha la acción que claramente tenía para reivindicar la parcela de la posesión de Calvo. A partir del 1898, la prescripción no corre, y pretender que lo preceptuado en el Código Político y lo establecido con tanta claridad por la jurisprudencia sólo se refiere a la prescripción adquisitiva, sería hacer ineficaces dichos precepto y principios. Equivaldría a decir que no se puede adquirir por prescripción contra

El Pueblo, y al mismo tiempo que se puede adquirir. Y como esto sería llegar a una conclusión absurda, es claro que no puede interpretarse la ley en tal sentido. (Véase el caso de *Remy* v. *Municipality,* 11 La. Ann., 148, en dónde una proposición semejante está ampliamente discutida.)

Veamos si era necesario que El Pueblo de Puerto Rico pidiera y obtuviera la nulidad de la sentencia declaratoria de dominio a favor de Enrique Calvo, antes de ejercitar la acción reivindicatoria que ha ejercitado. A nuestro juicio no lo era porque la del demandante en este caso no nace de la nulidad del título del demandado y es anterior a, e independiente de, dicho título.

La doctrina legal de que cuando se ejercita la acción reivindicatoria contra personas que están en posesión de la cosa objeto del pleito en virtud de un título que se tenía por legítimo, es preciso que antes se pida la nulidad de éste, sólo tiene aplicación cuando la nulidad produce la acción, pero no cuando el derecho de reivindicar es independiente de ella. (Sents. del T. S. de E. de 16 de octubre de 1873, 17 de enero de 1889, 6 de abril de 1889 y 13 de febrero de 1892.)

Examinemos la cuestión de cosa juzgada. Cuando se tramitaba el expediente de dominio en la corte de distrito, compareció el Comodoro de la Armada de los Estados Unidos, Comandante de la Estación Naval de San Juan, por medio del Fiscal de la Corte Federal, alegando que los terrenos cuyo dominio se trataba de acreditar pertenecían a los Estados Unidos y pidiendo que la corte se declarara incompetente para conocer del caso o concediera una prórroga para formular oposición. La corte resolvió que era competente y concedió la prórroga solicitada. No consta que el comodoro presentara formalmente su oposición, y el expediente se resolvió como ya se ha dicho declarando justificado el dominio a favor de Enrique Calvo.

La parte apelante alega que habiéndose convertido el expediente de dominio de *ex parte* en contencioso, la resolución final que se dictara en el mismo tiene autoridad de cosa

juzgada con respecto a los derechos de las partes controvertidos en este pleito.   Tal alegación no está bien fundada a nuestro juicio, 1°. porque no se formuló una verdadera oposición por parte de los Estados Unidos en el expediente .de dominio; 2°., porque no fué El Pueblo de Puerto Rico el que formuló la oposición (si es que verdaderamente la hubo) y 3°., porque las sentencias declaratorias del dominio dictadas en los expedientes que autoriza la Ley Hipotecaria, no tiene autoridad de cosa juzgada.

El Tribunal Supremo de España resolvió que había cometido error una corte sentenciadora que había dejado de aprobar un expediente posesorio en que el Promotor Fiscal se había opuesto como representante del Estado, sin que llegara a formular su oposición de acuerdo con la ley, estableciendo así la doctrina de que, para que pueda considerarse y resolverse una oposición no basta la alegación de tal oposición sino que es necesario formularla y sostenerla de acuerdo con la ley.   Cuando la oposición no se verifica de este último modo, no cambia la naturaleza del expediente.   (51 Jurisprudencia Civil 346.)

Veamos la reconvención.   El apelante alega que Calvo invirtió grandes sumas en la desecación de los manglares y que las mejoras por Calvo realizadas en la porción que el apelante sostiene que le corresponde, ascienden a cinco mil pesos.   Y alega además el apelante que en el caso de que la demanda se declare con lugar, entonces debe condenarse al demandante a pagarle la dicha suma de cinco mil pesos.

A primera vista, sin necesidad de una amplia consideración, se concluye que la reconvención carece de todo fundamento.

Los actos de Calvo al desecar los manglares fueron voluntarios y nada demuestra que estuvieran autorizados por el Estado Español.   Por el contrario, todo induce a crear que esos terrenos desecados formaban parte de un monte del Estado declarado reservable.   El verdadero camino que debió haber seguido Enrique Calvo, no era el de tramitar un expe

diente para acreditar un dominio que en realidad de verdad no había adquirido totalmente por ninguno de los medios reconocidos en derecho, sino el de dirigirse al nuevo Soberano exponiéndole la equidad de su caso, si es que había procedido de buena fe, y pidiéndole que hiciera lo qué no llegó a hacer el Soberano antiguo.

Por las razones expuestas, el recurso establecido debe declararse sin lugar y confirmarse la sentencia apelada en la parte en que lo ha sido.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociado MacLeary.

Juez disidente: Sr. Wolf.

El Juez Asociado Sr. Aldrey, no tomó parte en la resolución de este caso.