Esteban, Isaías y Claudia González Rodríguez, demandan-
tes y apelados, .v. Telésforo Fumero y su esposa Eufe-
mia González Rodríguez, demandados y apelantes

No. 4348.—*Visto:* Marzo 23, 1928. *Resuelto:* Julio 16, 1928.

G. *Zeno Sama,* abogado de los apelantes; *L. Mercader,* abogado de los apelados.

El Juez Asociado Señor Texidor, emitió la opinión del tribunal.

La demanda en este caso estableció sustancialmente lo siguiente:

Agustín González, padre de los demandantes y de la demandada Eufemia González, era dueño de una finca rústica de seis cuerdas, en Sabana Hoyos, Arecibo, de otra de cinco cuerdas, de otra de diez cuerdas, y de otra de diez y nueve cuerdas, en el mismo término municipal; y por escrituras de distintas fechas, y ante distintos notarios, apareció traspasando a los demandados, por precios diversos, tales fincas; y se alega por los demandantes que en esos traspasos o ventas no medió precio real ni recibo de dinero o efectos a tales títulos y calidad, ni hubo en ninguno de ellos una causa contractual real y efectiva, sino que las supuestas enajenaciones se realizaron por consecuencia de que los demandantes llamaron a su padre Agustín González la atención hacia la vida impropia que llevaba, sosteniendo relaciones maritales con una mujer, y el padre, ofendido, abandonó la casa de los demandantes, yéndose a vivir con la demandada y su esposo; y confabulándose con éstos, llevó a cabo los relacionados traspasos simulados, para privar a los demandantes de participación en su futura herencia; que los demandados prometieron al don Agustín atender a sus fincas, y han venido aprovechándose de los frutos de mismas, al amparo de las supuestas ventas; que los demandados agruparon las fincas de 5, 10 y 19 cuerdas, y

luego la resultante con la de 6 cuerdas, formando una de 43 cuerdas que hicieron inscribir en el registro de la propiedad; que don Agustín González nunca dejó de ser dueño de las fincas citadas, hasta su muerte, y desde esta fecha, o sea desde mayo de 1926, son dueños de ellas los demandantes, en común proindiviso con la demandada, y a razón de una cuarta parte cada uno. Alegan que los demandados se han utilizado de los frutos de las fincas, por cuatro años, y en un montante de $2,400 y las han gravado con una hipoteca por $2,000, cantidad que tomaron a préstamo con tal garantía, y de la que nada entregaron a D. Agustín ni a los demandantes; y finalmente insisten en la alegación de que los traspasos fueron falsos, simulados y producto de una confabulación entre los demandados y D. Agustín González, y que éste, después de tales escrituras, continuó siendo el dueño de las fincas. Sobre la base de tales alegaciones descansa su petición de que se declare que los referidos traspasos son ineficaces, e inexistentes en derecho, y que los demandantes son dueños de una cuarta parte cada uno, de dichas fincas, como hijos legítimos y herederos de don Agustín González, calidad respecto de la que se ha hecho la necesaria alegación, y que se condene a los demandados a pagar a los demandantes $3,300 como su parte en los frutos y dinero retenido por los demandados.

En la contestación los demandados admitieron el fallecimiento de Agustín González, y el hecho de ser los demandantes y la demandada Eufemia, los hijos legítimos de dicho señor; en cuanto a la finca de 6 cuerdas, negaron la alegación correspondiente, alegando que la demandada la compró a su padre en $500, que el vendedor confesó recibidos, antes de la escritura; negaron la simulación y confabulación en las otras ventas, y alegaron que esas fincas de 5 y 10 cuerdas fueron vendidas por Agustín González a Fumero, por precio de $300 y $600, que el vendedor confesó recibido antes del otorgamiento de la escritura; negaron la simulación de venta de la finca de 19 cuerdas, y alegaron

que Agustín González la vendió a Fumero por precio de $1,450, que confesó el vendedor haber recibido antes de otorgar la escritura; negaron la confabulación y la simulación en los traspasos, y alegaron la existencia de unas negociaciones reales entre las partes; alegaron haber utilizado los frutos de las fincas como dueños de las mismas, y negaron el montante que a tales productos fija la demanda; negaron que los demandantes sean dueños en parte alguna, de los bienes citados. Y como defensa alegaron que don Agustín González hizo entrega a los demandados de las fincas que les vendió; que ellos han inscrito el dominio de las mismas en el registro de la propiedad, por expediente de conversión de inscripción posesoria en de dominio, y han constituido hipoteca sobre la finca resultante de la agrupación de las otras, siendo tal garantía a favor del Federal Land Bank of Baltimore, y por $2,000; que la acción que ejercitan los demandantes se halla prescrita, por virtud del artículo 1268 del Código Civil. Y pidieron se desestimase la demanda.

Se oyó el caso ante la Corte de Distrito de Arecibo, y se presentó por las partes la prueba documental y testifical tendente a sostener las respectivas contenciones. Y la corte dictó sentencia en 23 de marzo de 1927, en favor de los demandantes. Contra esta sentencia se interpuso el presente recurso de apelación.

Por la parte apelante se asignan a la sentencia seis errores, de los que trataremos, agrupando aquellos cuya naturaleza lo requiere o lo consienta.

No hemos de entrar en el estudio de tales señalamientos de error, sin ver primero cuáles son los hechos que deben estimarse como probados, para determinar el derecho que les es aplicable.

Hemos hecho el estudio del récord taquigráfico, y entendemos que la corte de distrito llegó a una justa, juiciosa y cuidadosa apreciación de la prueba, en la que indudablemente se han seguido aquellos principios de evidencia que

reconoce y consagra nuestra ley sobre esa materia, en varios de sus artículos, como el 4, en que se dice que solamente se exige la certeza moral, o un grado de prueba que produzca la convicción en un ánimo no prevenido. Y en el 99, en que se define la inferencia, dándola como base los hechos legalmente probados y las deducciones que de ellos justifiquen las ordinarias propensiones y pasiones humanas, el curso de los negocios, etc. El juez sentenciador, en la apreciación de la prueba, ha tenido presente tales principios, y los de la Lógica, y ha llegado a apreciar la evidencia de acuerdo con lo preceptuado en el artículo 162 de la Ley de Evidencia, sometiéndola a sana discreción jurídica y a las reglas estatuidas.

Veamos cuáles son los hechos. Dice el juez, en la opinión, páginas 11, 12, 13 y 14:

"A mediados del año 1921 los demandados residían en el barrio de Florida de Barceloneta en donde tenían arrendada una finca. En razón a que Fumero estaba en malas condiciones económicas hubo de abandonar la finca, yéndose a vivir con su esposa a Riestra, sitio del barrio Sabana Hoyos, de Arecibo, a casa de su hermano Rosendo. Estando en Riestra fué a convivir con ellos don Agustín González, disgustado por cuestiones familiares con los demandantes, con uno de los cuales, el llamado Isaías, vivía. Al cabo de tres meses don Agustín y los demandados se trasladaron a vivir a una finca del primero, compuesta de cuarenta cuerdas, situada en el mismo barrio de Sabana Hoyos. Allí Fumero prestaba sus servicios remunerados con un dólar diario, y más tarde fué interesado en la siembra de varias cuerdas de caña en la finca a partir utilidades. Don Agustín a los pocos días de estar con su hija Eufemia, cayó gravemente enfermo con fiebre perniciosa, asistiéndole el Dr. R. Vergne. En noviembre de 1921 don Agustín fué requerido por la Mercantil Roses y Co. para el pago de una deuda de quinientos dólares. El demandado Fumero aconsejó a don Agustín el traspaso de algún terreno para levantar una hipoteca y pagar esa deuda. En 21 de noviembre de 1921 y por escritura pública que fué debidamente inscrita, don Agustín traspasó a su hija Eufemia González Rodríguez, casada con Telésforo Fumero, una parcela de seis cuerdas que segregó de su finca de cuarenta cuerdas, por precio de $500.00 que confesó haber recibido antes del otorgamiento de la escritura de

manos de la compradora. A pesar de consignarse ésto aparece de la declaración de la propia Eufemia González que tal pago no había sido hecho como se consigna en la escritura sino que fué 'ese mismo día, por la tarde, que le entregó el dinero; 'aunque manifiesta acto seguido que 'no fué el mismo día sino diez o doce días después', o sea, en los primeros días de diciembre de 1921. En carta que en 8 de enero de 1922 ella escribió a su hermana Claudia a Islas Canarias, le dice que su padre 'ni aun al médico ha podido pagar.' Ella declaró que en diciembre le entregó los $500.00 de la venta a don Agustín y éste no satisfizo la cuenta del Dr. Vergne que sólo montaba a $104.00, como se verá más luego, como tampoco satisfizo la deuda de Roses y Co. Hecho este traspaso, es lo cierto que Fumero hizo gestiones en Arecibo y Manatí para obtener el dinero mediante hipoteca sobre esa parcela y fracasó en sus empeños.

"Entonces Fumero instó e indujo a don Agustín le traspasase el resto de la finca para él hipotecarla en su totalidad al Banco Federal y poder obtener así dinero para el pago de las deudas de Roses y Co., del Dr. Vergne y otras. Fumero hizo creer a don Agustín, quien tenía alrededor de noventa años de edad, que el Banco no celebraba esa clase de contratos con personas de una edad tan avanzada como la suya. En 25 de mayo de 1922 y por escritura pública don Agustín traspasó a Telésforo Fumero el resto de su finca de cuarenta cuerdas, o sea, treinta y cuatro cuerdas por precio de $1,450.00 que confesó haber recibido antes del otorgamiento de la escritura. Este documento fué inscrito en cuanto a 19 cuerdas por ser la cabida resultante del Registro y denegado respecto a las otras quince cuerdas por aparecer inscritas a nombre de tercera persona. En vista de estas circunstancias, un nuevo documento fué otorgado. El 10 de junio de 1922, y por escritura pública debidamente inscrita, don Agustín traspasó a Telésforo Fumero dos parcelas de cinco y diez cuerdas, respectivamente, por precio de $300.00 y $600.00, cantidades que confesó haber recibido antes del otorgamiento de la escritura. A pesar de consignarse en estas dos escrituras el pago, aparece conforme a la declaración de don Lorenzo Oliver, testigo de los demandados, que la deuda de don Agustín en casa de Roses y Co., que en 1922 ascendía a $510.15, fué afianzada por el propio don Agustín por medio de unos pagarés personales y que la misma no fué pagada hasta marzo 21 de 1923 en que montaba con sus intereses a $558.28, mediante cheque expedido por Fumero, o sea, poco después de éste haber hipotecado la finca al Banco Federal por $2,000.00 y aparece asimismo de la declaración del Dr. Vergne, también testigo

del demandado, que la deuda de don Agustín por servicios médicos a él prestados, no fueron pagados hasta abril de 1923, o sea, poco después de hipotecada la finca por Fumero al Banco Federal. Fumero en el mismo documento agrupó estas quince cuerdas, más las diez y nueve traspasadas en 25 de mayo de 1922 e inscritas, haciendo una sola finca de treinta y cuatro cuerdas.

"A través de todas estas operaciones don Agustín continuó ejerciendo actos de dominio sobre la finca y sufragando los gastos de la casa en que vivía con sus hijos los demandados. Éstos promovieron en noviembre de 1922 un expediente de conversión de posesión en dominio de la parcela de seis cuerdas y de la finca de treinta y cuatro.

"El 9 de diciembre de 1922 y mediante escritura, estas fincas fueron agrupadas constituyendo una sola de cuarenta cuerdas y así inscrita a favor de los demandados. El 10 de marzo de 1923 hipotecaron esa finca al Federal Land Bank of Baltimore por la suma de $2,000.00. Ya en su poder ese dinero, el día 21 del mismo mes y año Fumero pagó a Roses y Co. la deuda que en dicha mercantil tenía pendiente don Agustín y que ascendía entonces a $558.28. Y en abril 16 de igual año Fumero pagó al Dr. Vergne 'la suma de $60.00 a cuenta por honorarios y $10.00 para pago de la enfermera.' Y aunque en dicha cuenta se hace constar que el total de la misma es $104.00 y que resta la suma de $34.00, en abril 28 el Dr. Vergne expidió a Fumero recibo por la 'cantidad de $204.00, importe de la cuenta de honorarios médicos por servicios prestados a don Agustín González.' Don Agustín sufrió también el año 22 de una pulmonía. Él continuó viviendo en la finca objeto de este pleito hasta mayo de 1926 en que murió."

Encontramos que los hechos no son otros que los allí presentados por el juez sentenciador. No hay la más leve indicación de pasión, prejuicio o parcialidad de parte del juzgador. No hay error en la apreciación de la evidencia, que quizá no puede ser calificada de realmente contradictoria. Y con esta declaración, resuélvense los señalados como errores bajo los números Segundo y Tercero, que no admitimos como tales.

Refiriéndose los demás señalamientos a la existencia o a la carencia de causa en los llamados contratos de venta (señalamiento primero); a la prescripción de la acción de nulidad (señalamiento cuarto); a la necesidad de ejercitar

previamente la acción de nulidad (señalamiento quinto); y a la incapacidad de los demandantes para ejercitar su acción contra actos de su padre, de quien son herederos.

■■■ Hay en la demanda alegación de simulación de contratos, y precisa una declaración correcta acerca de la existencia del contrato mismo, antes de formular juicio alguno en lo que respecta a la reivindicación.

La simulación es algo que afecta al mismo tiempo a dos elementos esenciales del contrato: el consentimiento, y la causa. No es extraño que así sea, ya que esos dos elementos de la contratación conservan siempre un fortísimo lazo de unión, por ser la causa propulsora y determinante de aquél, en la esfera contractual, y en casi todas las esferas del derecho civil. Nadie consiente sin que a la determinación de su voluntad preceda la presencia de una causa, de un motivo para consentir. Y de aquí que el vicio que anula o que simplemente mancha la causa, se refleje en el consentimiento. A causa ilícita, consentimiento ilícito, puede decirse.

El tratadista Sánchez Román, en sus estudios sobre Derecho Civil, ha dicho lo que sigue:

"Lo que hay es, que cuando la declaración o manifestación externa de un contratante no está conforme con su verdadera voluntad, esa declaración puede calificarse de contradictoria o de ambigua. Es lo primero, cuando se quiere una cosa y se declara otra; y es lo segundo cuando la declaración es defectuosa u obscura, en orden a la expresión de la voluntad, pero no opuesta a la voluntad declarada. Distínguese también, en el caso de declaración contradictoria la contradicción voluntaria y maliciosa, y la contradicción involuntaria e inconsciente.

"Es voluntaria la contradicción, cuando deliberadamente se declara una cosa, y se quiere otra; se declara vender, y lo que se quiere y hace en realidad es donar. En este caso se produce el vicio jurídico que se llama simulación, que es la contradicción voluntaria entre la declaración y la voluntad declarada, al cual se aplica aquella regla *plus valet quod agitur quam quod simulatur*. Es involuntaria la contradicción cuando el contratante, sin quererlo, declara lo contrario de lo que es su voluntad."

Aparecen estos párrafos del eminente tratadista, en el apartado o número 11 del párrafo 2, artículo I, capítulo X, del tomo 4 de su obra "Derecho Civil," página 190 del citado tomo, y en relación con el consentimiento en los contratos.

Y, hablando de la causa en los contratos, en el mismo tomo y obra, dice el Sr. Sánchez Román:

"Por lo demás, la causa que no es lícita, es como si no existiera para el Derecho, y degenera, por tanto, en inexistente, y no verdadera o falsa para el mismo, produciendo el consiguiente resultado de viciar el consentimiento y anular el contrato, así como dando lugar a la repetición de lo entregado o pagado, cuando la torpeza o injusticia estuviese tan sólo de parte del que recibió aquellos pagos o entregas; pero no procederá la repetición si la torpeza fuera común a ambas partes."

Por el concurso de los tres requisitos esenciales que determina el artículo 1228 de nuestro Código Civil (artículo 1261 del Código Civil de España) se produce, en la vida del derecho, el contrato. El Código ofrece una fórmula de exclusión, cuando en ese artículo dice:

"No hay contrato sino cuando concurren los requisitos siguientes:"

La expresión "No hay contrato" excluye de esa calificación jurídica todo lo que no esté dentro de la concurrencia de los tres requisitos. Deja de concurrir uno de ellos, y el contrato no nace, no adquiere realidad.

Tratando del consentimiento como "concurso" de voluntades, dice el tratadista Manresa:

"La esencia del consentimiento es la conformidad de las partes sobre lo que ha de constituir el contrato, la aceptación por la una de la oferta que por la otra se le hace; es el concurso de que la ley habla, sobre la cosa y la causa que han de constituir el contrato." (Manresa, Código Civil Español, tomo 8, p. 648.)

Y Mucius Scaevola, en sus comentarios al Código Civil Español, tomo 20, pág. 585, se expresa así:

"Lo general es esto, el concurso de voluntades, lo simultáneo de la expresión de la conformidad de dos o más personas en el objeto de la relación jurídica que quieran crear. El contrato nace, se genera, por el ayuntamiento de la voluntad de las partes (ya que la vida se ofrece también en el campo del derecho como en el de la Naturaleza) y para originar el nuevo sér, necesaria es la reunión de los dos elementos generadores, consistentes, en el contrato, en la voluntad de las partes."

■■ En los casos de simulación de contrato, es evidente que falta el consentimiento, y en general, falta la causa. Y entonces, como ha dicho Manresa, el caso es el más claro de inexistencia.

El Tribunal Supremo de España, en sentencia de fecha 30 de noviembre de 1909, pág. 501 *et seq.*, tomo 116, Jurisprudencia Civil, ha dicho lo que sigue:

"Considerando que no es dable confundir un contrato simulado con un contrato nulo o rescindible, toda vez que la simulación significa indudablemente por su propia naturaleza la inexistencia del contrato, al contrario de lo que acontece respecto de los segundos; en los que, supuesta su realidad y certeza, es obligado examinar las condiciones de su celebración para resolver acerca de la procedencia de la nulidad o rescisión, examen absolutamente improcedente por contradictorio cuando el contrato no ha existido, ya que de la inexistencia no se pueden deducir más consecuencias jurídicas que las que necesariamente se derivan de esta misma inexistencia, o sean las procedentes cual si no se hubiese intentado siquiera la celebración de tales supuestos contratos;

"Considerando que esto sentado, como la Audiencia de Cáceres estima justificado que los de que se trata fueron simulados, es decir que no existieron, habiendo sido realmente fingidos para burlar por este procedimiento los derechos de los nietos reclamados al morir la abuela doña María del Rosario Fernández de Aguilar y González, es manifiesto que cualquiera que sea la propiedad con que el Tribunal sentenciador declara la rescisión de los contratos discutidos, como hay que partir del hecho de la simulación o inexistencia de los mismos por no impugnarse en el recurso, ninguna aplicación tienen las reglas y preceptos que regulan la materia de la rescisión ni aun los de la misma nulidad, sino solamente las consecuencias que el mismo Tribunal deduce, cuales son las que, como queda expuesto, producen el

hecho culminante de la inexistencia, o sean las de que los bienes sobre que versa la cuestión del pleito no salieron realmente del poder de la supuesta vendedora, y que por lo mismo constituyen parte del haber hereditario a su fallecimiento."

En el caso de que se trata había unos pretensos contratos de compraventa, con el verdadero objeto de traspasar a una persona gratuitamente bienes que, en el futuro podían contarse como herencia de la cedente. No hubo ni una transmisión efectiva de las fincas, ni un precio real y cierto. De las escrituras aparecía la compraventa, como aparecían la transmisión del título y la entrega del precio. La realidad era otra, y contraria a las manifestaciones de los otorgantes. De aquí la simulación.

Conviene en este caso que resolvemos, la cita hecha, porque aparte de la declaración en cuanto a la inexistencia del contrato por haber intervenido la simulación, se establece la cualidad jurídica de los bienes, análoga a la del caso ante nosotros, diciéndose

"que los bienes sobre que versa la cuestión del pleito, no salieron realmente del poder de la supuesta vendedora, y que, por lo mismo, constituyen parte del haber hereditario a su fallecimiento."

La prueba en el caso presente autoriza a creer, como lo creyó la corte de distrito, que no hubo entrega de precio en los expresados contratos, y que las fincas que aparecían objeto de las pretensas ventas no pasaron nunca del poder de don Agustín González, que continuó ejerciendo actos de dominio sobre ellas.

No basta con la consideración de los principios generales en cuanto al consentimiento y la causa. Preciso se hace traer la luz de esos principios al contrato de compra y venta. Y al hacerlo así, en este arquetipo de los contratos consensuales, encontramos que el contrato requiere, de acuerdo con el artículo 1348 del Código Civil, la obligación de uno de los contratantes de entregar el precio, y del otro de entregar la cosa vendida. Y si no existen esas obligaciones, si no hay transmisión por parte de un contratante, de la

cosa, y por el otro de la estimación de su valor o precio, no hay propósito de entregar la una y el otro, no hay tan sólo la falta de la causa, sino del consentimiento.

No hubo, pues, contrato en los casos acusados en la demanda; y nos encontramos frente a lo que Manresa tiene por caso típico de inexistencia.

██ Si el caso es de inexistencia, es obvio, de acuerdo con los principios del Derecho, que no cabe la prescripción. No hay en el terreno puramente jurídico, un fundamento que autorice a tratar de la prescripción, ya que el artículo 1267 del Código Civil exige, para darle el carácter de anulables, *contratos en los que concurran los requisitos expresados en el artículo 1228,* aunque heridos de vicio o defecto. Un consentimiento viciado puede dar origen a un contrato, porque cabe la confirmación de éste, que hace desaparecer el vicio. Pero es preciso que el consentimiento haya sido una realidad; realidad enferma, pero realidad siempre. Donde no cabe confirmación es en donde no hay consentimiento, o donde falta otro de los requisitos esenciales del contrato. En el caso ante nosotros, estúdiese la cuestión desde cualquier punto de vista, y ya sea que falte el consentimiento como concurso de voluntades para comprar y vender, ya sea que no exista la causa, el hecho es que el contrato no existe por no concurrir en el acto de que se trata, los requisitos esenciales para la creación de tal contrato.

En el caso *Oliver* v. *Oliver,* 23 D.P.R. 181, este tribunal ha sostenido, en lo que afecta a la falta de un requisito esencial del contrato, y a sus consecuencias, lo que sigue:

"El 'consentimiento de las partes contratantes,' requerido por el artículo 1228, falta por completo en uno u otro caso, y según el lenguaje sencillo de ese artículo 'no hay contrato.' No hay nada por 'anularse', dentro del significado del artículo 1267, nada en que pueda fundarse 'la acción de nulidad' a que se refiere el artículo 1268.''

Quedan así resueltos los supuestos errores que aparecen

señalados bajo los números Primero y Segundo, por la parte apelante.

Realmente, el señalamiento de error que aparece bajo el número cuarto no hace referencia más que a la prescripción, siquiera se insista, de una manera ocasional, en lo que refiere a la existencia de causa, indicando que hay un contrato. Esta misma manera de proceder al insistir en la existencia del contrato, indica que la apelante se da exacta cuenta de que sólo sobre esa base podría invocar la prescripción.

Para anular un contrato en el que han concurrido los requisitos necesarios para su existencia (artículo 1267 del Código Civil) se dan los términos del artículo 1268 del mismo Código. Pero lo que se precisa es que haya contrato, y que lo haya por la concurrencia de los elementos que señala el artículo 1228, sin lo que "no hay contrato." Y si no existe tal contrato jurídico, no hay aplicación de este precepto de prescripción de acción: tal el caso de la inexistencia de contrato.

En el caso *Oliver* v. *Oliver, supra,* se ha dicho (terminando el párrafo que antes se cita en esta opinión):

". . . De aquí se infiere que la prescripción alegada no constituye defensa alguna en una acción reivindicatoria de bienes inmuebles así vendidos."

En el caso *Sucesión Suro* v. *Sucesión Prado,* 21 D.P.R. 241, este tribunal estimó y declaró que:

"La duración de la acción de nulidad a que se refiere el artículo transcrito sólo es aplicable, según el artículo anterior, 1267, a los contratos en que concurran los requisitos que expresa el artículo 1228, siempre que adolezcan de alguno de los vicios que los invalidan con arreglo a la ley, siendo aquellos requisitos, consentimiento de los contratantes, objeto cierto que sea materia del contrato, y causa de la obligación que se establezca."

Y luego se dice:

"Tenemos, pues, que aceptar como hecho admitido por ambas partes para decidir sobre duración o prescripción de la acción de nu-

lidad de la escritura de 29 de noviembre de 1879, que doña Encarnación Prado intervino en dicha escritura por sí y en representación de los menores hijos de don Juan Suro, no en concepto de curadora *ad litem* de los mismos, sino en el de madre con *patria potestad* sobre ellos. Siendo ello así, como la madre, según la legislación de Partidas vigente en la fecha del contrato, no tenía *patria potestad* sobre sus menores hijos, la cual competía únicamente al padre, leyes 2 y 3, título XVII, partida 4a., surge como consecuencia lógica que los menores hijos de don Juan Suro no tuvieron representación alguna en la mencionada escritura ni bajo concepto alguno intervinieron en ella, ni por tanto prestaron su consentimiento al contrato por sí o por medio de representación legal. Faltó, pues, en el contrato, por parte de los menores Suro, el consentimiento que debió prestar su representante legal, representante que no aparece existiera, ya que su madre no podía representarlos por falta de tutela o curatela o de patria potestad sobre los mismos, y por falta de semejante requisito la acción de nulidad del contrato no puede regirse por el artículo 1268 del Código Civil, aplicable como hemos dicho antes a los contratos en que concurren todos los requisitos que expresa el artículo 1228.''

En la decisión en el caso *Cruz* v. *Sucesión Gregorio Kuinlan,* 29 D.P.R. 877, dijo este tribunal:

''El segundo motivo de error se refiere a la infracción del artículo 1268 del Código Civil.

''Ese artículo se halla en capítulo que trata de la nulidad de los contratos y dispone que la acción de nulidad sólo durará cuatro años, y fundándose en él los apelantes y en que la venta tuvo lugar en el año 1910 alegan que la acción para pedir su nulidad está prescrita por haber sido presentada la demanda después de los cuatro años.

''El tiempo de prescripción fijado en ese precepto es, como dice el artículo precedente 1267, para los contratos en que concurren los requisitos del artículo 1228, o sea en los que hay consentimiento, objeto y causa, si adolecen de algunos de los vicios que los invaliden con arreglo a la ley.''

En el caso *Solá* v. *Castro,* 32 D.P.R. 804, este tribunal ha sostenido en su integridad la doctrina legal expuesta en el caso *Oliver* v. *Oliver,* que queda citado.

El fundamento jurídico de esa doctrina aparece expresado en la sentencia del Tribunal Supremo de España de

fecha 30 de noviembre de 1909 que antes se cita en esta opinión. Dice el Tribunal Supremo de España:

". . . ya que de la inexistencia no se pueden deducir más consecuencias jurídicas que las que necesariamente se derivan de esta misma inexistencia; *o sean las procedentes cual si no se hubiese intentado siquiera la celebración de tales supuestos contratos.*" (Itálicas nuestra).

De algo que no ha tenido nunca existencia jurídica, es imposible extraer consecuencias de ese orden, o de otro cualquiera. Y para establecer la prescripción, falta el contrato, falta la fecha o la época de que ha de partirse para computar el tiempo. No existe, pues, el error señalado en cuarto lugar.

En cuanto al marcado bajo el número quinto, tampoco aparece la existencia de tal error.

Se ha repetido, por la jurisprudencia constante de Puerto Rico, el principio que rige en esta materia. Señaladamente, en los casos *Sucesión Nieves* v. *Sánchez,* 17 D.P.R. 878; *Oliver* v. *Oliver,* 23 D.P.R. 181; *El Pueblo* v. *Sucesión Valdés,* 31 D.P.R. 223, y *Amy* v. *Sucesión Verges,* 33 D.P.R. 372.

Cuando la parte demandante no deriva necesariamente su derecho de la nulidad del título de la demandada, sino de hechos y causas distintos de tal nulidad, no tiene aplicación la doctrina de previo ejercicio de la acción de nulidad.

En la decisión del caso *Oliver* v. *Oliver, supra,* se estudia esta materia con toda extensión, y se mantiene el principio legal que antes dejamos enunciado.

En el caso *El Pueblo* v. *Sucesión Valdés,* 31 D.P.R. 223, se cita la opinión en el caso *El Pueblo* v. *Dimas,* 18 D.P.R. 1061, en el que este Tribunal Supremo expuso la doctrina en este particular en la forma que sigue:

"La doctrina legal de que cuando se ejercita la acción reivindicatoria contra personas que están en posesión de la cosa objeto del pleito en virtud de un título que se tenía por legítimo, es preciso que antes se pida la nulidad de éste, sólo tiene aplicación cuando la nulidad produce la acción, pero no cuando el derecho de reivindicar

es independiente de ella. (Sents. del T. S. de E. de 16 de octubre de 1873, 17 de enero de 1889, 6 de abril de 1889 y 13 de febrero de 1892.)''

Y la decisión en este caso, *El Pueblo* v. *Sucn. de Valdés,* confirma esa doctrina. En *Amy* v. *Sucn. Verges,* ya citado, resolviendo acerca de esta misma materia, se confirma la doctrina legal establecida.

En *Sucn. Nieves* v. *Sucn. Sánchez,* en la opinión de los Jueces Asociados Sres. del Toro y Wolf, se expresa la misma doctrina, citándose las sentencias del Tribunal Supremo de España a que se hace referencia luego en el caso *El Pueblo* v. *Dimas.*

En estos casos de simulación de venta, y para los efectos de la acción que se ejercite, es imprescindible tener presente lo dicho en la Sentencia del Tribunal Supremo de España de fecha 30 de noviembre de 1909 que antes hemos citado:

''. . . . sino solamente las consecuencias que el mismo Tribunal deduce, cuales son las que, como queda expuesto, producen el hecho culminante de la inexistencia, o sean las de que los bienes sobre que versa la cuestión del pleito no salieron realmente del poder de la supuesta vendedora, y que, por lo mismo constituyen parte del haber hereditario a su fallecimiento.''

Y así, el título de los demandantes es su derecho hereditario, sin que en los demandados haya título, ya que la inexistencia del contrato no deja lugar a la creación de título alguno.

No existe, pues, el error que se señala bajo ese número quinto.

Se señala como error que se declaró con lugar la demanda estando impedidos los demandantes para ejercitar la acción, por ser herederos y continuadores de la personalidad de su padre, y no poder ir contra sus propios actos.

El principio no puede aplicarse en todos los casos. Cuando se trata de actos que crean derechos y obligaciones, que tienen eficacia jurídica, la ley, en protección del estado

legítimo, de derecho, que por tales actos se ha creado, cierra el paso a los que los realizaron, para impedirles que los contradigan en sus efectos y consecuencias. Pero esto se hace sobre la base de la existencia de estados de derecho en los que se dan la verdad y la legitimidad como elementos esenciales.

El Tribunal Supremo de España, en sentencia de 13 de julio de 1892, ha dicho:

". . . que el principio de que no se puede ir contra los propios actos, supone que los actos que se invocan como excepción tengan significación y eficacia jurídicas contrarias a la acción intentada. . ."

Y en la de 10 de marzo de 1890 dijo el mismo Tribunal Supremo de España:

"El principio según el cual nadie puede ir válidamente contra sus propios actos, se refiere a los que, como expresión del consentimiento se realizan con el fin de crear, modificar o extinguir algún derecho."

No se dan esas condiciones en los casos de simulación de contrato, que ni crean, modifican o extinguen derecho alguno, ni producen nada eficaz.

En sentencia de 24 de abril de 1895, el mismo Tribunal Supremo de España ha sostenido que no cabe invocar la doctrina de que nadie puede ir en juicio contra sus propios actos, cuando el supuesto acto obstativo carece de eficacia obligatoria. Y en otra sentencia del mismo Tribunal Supremo, de fecha 7 de diciembre de 1896, se ha declarado que los actos contra los cuales no es lícito accionar a quien los ha ejecutado ni a sus sucesores universales, son aquellos que, por su carácter trascendental, o por constituir convención, causan estado, definiendo de modo inalterable la situación jurídica de su autor.

No existiendo en este caso un contrato, y no habiéndose creado derecho de ninguna clase por las escrituras simuladas de que se trata, no puede concederse que la corte inferior errara en la forma que se acusa en el señalamiento marcado con el número sexto.

Queda aún por considerar el señalamiento de error número tercero.

Es innecesario citar decisiones. Son tantas y tan constantes las que establecen en esta jurisdicción la doctrina de que, salvo los casos de pasión, prejuicio, parcialidad o manifiesto error en cuanto a la apreciación que de la prueba haga el tribunal *a quo,* este Tribunal Supremo no ha de cambiar o modificar tal apreciación, que el citarlas sería una larga tarea, no justificable.

En la apreciación de la prueba, la Corte de Distrito de Arecibo ha sido prudente y lógica, y de tales normas de conducta judicial ha nacido el acierto con que la prueba fué pesada y estimada en el litigio. La corte tomó la prueba en su conjunto, y de los elementos probatorios destacó los hechos que una sana conciencia puede y debe aceptar como resultado.

No existe tampoco el señalado error.

Por las consideraciones apuntadas, *debe confirmarse la sentencia recurrida.*